UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-4437

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

        v.

KENNETH EUGENE PORTER,

                Defendant - Appellant.

Appeal from the United States District Court for the Eastern
District of North Carolina, at Raleigh.  Terrence W. Boyle,
District Judge.  (5:06-cr-00195-BO-1)

Argued:  May 14, 2009                    Decided:  July 21, 2009

Before AGEE, Circuit Judge, HAMILTON, Senior Circuit Judge, and
C. Arlen BEAM, Senior Circuit Judge of the United States Court
of Appeals for the Eighth Circuit, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Leza Lee Driscoll, Raleigh, North Carolina, for
Appellant.  Anne Margaret Hayes, OFFICE OF THE UNITED STATES
ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF:**
George E. B. Holding, United States Attorney, Banumathi
Rangarajan, Assistant United States Attorney, OFFICE OF THE
UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Kenneth Porter appeals from the district court's denial of his motion to suppress two witnesses' out-of-court identifications of Porter as the perpetrator of a liquor store robbery in Raleigh, North Carolina. Porter further challenges the district court's subsequent admission of these identifications at trial. Because, under the totality of the circumstances, the identification procedure utilized by the officers was not impermissibly suggestive and the identifications were reliable, we affirm.

## I.

### A. The Robbery

On May 24, 2006, an armed and masked robber entered a liquor store in Raleigh, fired a shot at a wall, and ordered the customers present to lie down on the floor at the front of the store. The robber also ordered two employees to empty their cash drawers. At one point, the intruder addressed a customer located near the back of the store and, thinking the customer was the manager, pointed the gun at the customer and demanded the combination to the safe. The robber repeated this demand as he ordered the customer to come to the front of the store and then to get on the floor. When the customer told the thief he did not work at the store, the robber stepped toward the

2

customer, pointed the gun at him, and fired a shot. That particular customer is one of the identifying witnesses.

During the robbery, the robber wore a loose-fitting mask, with hand-made holes fashioned for the robber's eyes. The customer who was shot at was able to see the robber's freckles and light-skinned complexion through those holes. Eventually, an employee opened the safe and the man took two bags found therein containing over $2,500, and left. The entire robbery was captured on the store's surveillance camera.

A call to 911 from a driver of a vehicle who saw the individual leave the liquor store, get into a car, and drive away provided the emergency operator with a description of the car. Later this driver, who followed the get-away vehicle, conveyed the license plate number and the route the automobile was traveling to the emergency operator. Although that witness eventually lost sight of the car, a patrol officer picked up the pursuit and activated the emergency blue lights and siren. The driver eventually stopped.

There were three people in the vehicle, including Kenneth Porter. All three occupants were arrested within twenty minutes of the robbery. One of the people arrested, a woman, told police that only Porter went into the liquor store. During a search of Porter's person, an officer found several items:

3

hollow point bullets, latex gloves, a short-sleeve cutoff shirt, and scissors.

Just prior to the robbery, the second identifying witness saw a man in the parking lot outside the liquor store. The man was standing in front of the witness's parked car and had the hood of his jacket pulled over his head, pacing. As she walked past the man to enter the store, she noticed he had a very fair complexion. As the woman left the store, a masked man entered carrying a gun. The woman then ran to her car and called 911. She heard a gunshot before she even reached her vehicle, and then watched the robber leave the store. The man was wearing blue jeans, a black jacket with red on it, a homemade mask, and a hood. The woman knew it was the same person she had just seen before entering the liquor store.

Raleigh officers arrived at the store less than five minutes after the individual left and immediately obtained descriptions of him. These descriptions were broadcast to other police officers and it was these descriptions that led the arresting officers to believe that the robber was Porter. After his arrest, police transported Porter back to the vicinity of the liquor store. The on-scene officers had taken the witnesses to a hotel across from the store. The officers placed the witnesses in a room, and asked them to peer out the window at the suspect and then indicate on a sheet of paper whether they

4

identified the suspect as the robber by writing "yes" or "no." They were told not to speak to each other. Outside, officers had Porter handcuffed and shined a light on him so the witnesses could see his face and body. Porter stood about ten to fifteen feet from the window. Both the woman outside the liquor store and the customer who was shot at during the robbery positively identified Porter.

Thereafter, the officers took Porter to the police station. During a search of the vehicle, the officers discovered a brown paper bag containing smaller bags of money underneath the back passenger seat behind the driver's side of the car. In the pouch behind the driver's seat, officers found surgical gloves and a hand-made mask. They also discovered a burgundy and black parka and, from underneath the back passenger seat, officers recovered a loaded .38 caliber Smith and Wesson revolver containing three spent cartridges.

Count One of the superseding indictment charged Porter with interfering with commerce by robbery in violation of 18 U.S.C. § 1951. Count Two charged Porter with using and carrying a firearm, which was discharged, during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii). Count Three charged Porter, having been previously convicted of a crime punishable by a term of imprisonment exceeding one year, with possession of a firearm in violation of 18 U.S.C. §

5

922(g)(1) and 924. Porter unsuccessfully moved to suppress the out-of-court identifications and any subsequent use of the identifications in court.

B.    Suppression Hearing

At the suppression hearing, Porter offered no evidence but challenged the two out-of-court identifications obtained during the show-up identification at the hotel, arguing that the show-up was impermissibly suggestive and unreliable, which likewise tainted the subsequent in-court identifications.

1.    Witness #1—Charles Renfrow

The identifying witness, Charles Renfrow, was in the liquor store during the robbery (and was shot at by Porter), and testified that he went to the liquor store around 7:30 p.m. on May 24, 2006, to buy alcohol. While Renfrow was in the back of the store, he heard a gunshot. As he turned around, the intruder pointed the gun at him, asked him if he was the manager, and ordered him to the front of the store. The gunman forced Renfrow to the floor and demanded the safe combination. When Renfrow said he did not know the combination, the robber fired the gun at him. At that time, the masked man stood within one foot of Renfrow.

Ironically, Renfrow held an associate's degree in criminal justice, testified that he continuously watched the robber, and focused on remembering that the robber "was wearing black tennis shoes, untied; blue jeans; a grayish colored tight shirt; a grayish colored mask; a pinkish at the bottom range suit-coat, with a dark color at the top, pinkish at the bottom." Renfrow also noticed the freckles under the robber's eyes because the man continuously adjusted the mask. Renfrow testified that the thief appeared to weigh 180 pounds and to be about six feet tall. At the show-up at the hotel, Renfrow positively identified Porter as the robber based upon his clothing, his height, his weight, his skin tone, and the shape of his chin. And, Porter wore "the same black tennis shoes, same blue jeans, same tight gray shirt." Porter's shoes were still untied during the show-up.

2.    Witness #2-Brenda Freeman

The second witness, Brenda Freeman, who had been outside the store prior to the robbery and saw the robber pacing in the parking lot, testified that she went to the liquor store on May 24, 2006, around 7:30 p.m. When she pulled into the parking lot, she noticed a man outside the store, standing a few feet from her car on the sidewalk. He caught her attention because he had his hood up over his head and it was not yet cold

outside. The man's face was not covered at the time. She remembered his face and his fair complexion. On her way out of the liquor store, a person wearing a mask entered and Freeman noticed that the masked person had a gun. She ran to her car and called 911. She heard a gunshot and shortly thereafter saw the robber leave the store, all of which she reported to the 911 operator. Freeman noticed that the robber was wearing blue jeans and a dark jacket with some red on it. At the show-up, Freeman instantly recognized the suspect as the person she saw before she went into the liquor store. She testified that "he was the face of the person [she] saw outside the store."

3. District Court's Ruling on the Suppression Motion

The court summarized that, given the witnesses' testimony along with the fact that there was another witness who followed the automobile that left the scene of the crime, and the fact that Porter had no chance to change clothes and was wearing the very clothes at arrest that the witnesses testified about from the robbery, it was almost like an "evidentiary chain," "ironclad, lay down identification." "[T]here isn't even an iota of unreliability about this. It's – it's almost like a movie camera following the robber until his arrest and return." The district court thus concluded that the show-up was not impermissibly suggestive and the identifications were reliable

8

under the totality of the circumstances, and denied Porter's motion to suppress.

After a jury trial, a jury found Porter guilty on all counts. The district court sentenced Porter to concurrent 235-month terms of imprisonment on Counts One and Three, and a consecutive 120-month term of imprisonment on Count Two. The total sentence of imprisonment was 355 months.

II.

We review a district court's legal conclusions made in the course of a denial of a motion to suppress evidence de novo and its factual findings for clear error. United States v. Saunders, 501 F.3d 384, 389 (4th Cir. 2007), cert. denied, 128 S. Ct. 1107 (2008). We review for abuse of discretion the court's rulings on the admissibility of evidence. United States v. Bostian, 59 F.3d 474, 480 (4th Cir. 1995).

We review de novo the court's legal conclusion as to whether the identifications violated the Due Process Clause. Saunders, 501 F.3d at 389. Due process principles prohibit the admission at trial of an out-of-court identification obtained through procedures "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968). "The Due Process Clause is not implicated, however, if

9

the 'identification was sufficiently reliable to preclude the substantial likelihood of misidentification.'" Saunders, 501 F.3d at 389 (quoting United States v. Johnson, 114 F.3d 435, 442 (4th Cir. 1997)) (concluding that even though a single-photo display was impermissibly suggestive, the identification was still reliable and did not violate due process). In order to determine whether a challenged identification procedure should be suppressed, the court engages in a two-step analysis. First, the defendant "must prove that the identification procedure was impermissibly suggestive." Holdren v. Legursky, 16 F.3d 57, 61 (4th Cir. 1994). "A procedure is unnecessarily suggestive if a positive identification is likely to result from factors other than the witness's own recollection of the crime." Satcher v. Pruett, 126 F.3d 561, 566 (4th Cir. 1997). If it was not, the inquiry ends. If the procedure was impermissibly suggestive, "the court then must determine whether the identification was nevertheless reliable under the totality of the circumstances." Holdren, 16 F.3d at 61.

A.    Impermissibly Suggestive

On appeal, Porter argues that the show-up was impermissibly suggestive in violation of his due process rights for several reasons: (1) Porter was the only suspect presented at the show-up, (2) the procedure utilized by the police for the show-up at

10

the hotel was inherently suggestive, and (3) the police offered no reason for failing to resort to less suggestive procedures. He further argues that the descriptions provided by the witnesses were unreliable.

To begin with, the exclusion of identification evidence is a "drastic sanction" which is "limited to identification testimony which is manifestly suspect." Harker v. Maryland, 800 F.2d 437, 443 (4th Cir. 1986). And, notwithstanding the conclusion reached by our colleagues in United States v. Brownlee, 454 F.3d 131, 138 (3d Cir. 2006), a case relied upon by Porter; in this circuit, prompt, on-the-scene show-ups are not per se suggestive and may in fact "promote fairness, by enhancing reliability of the identifications, and permit expeditious release of innocent subjects." Willis v. Garrison, 624 F.2d 491, 494 (4th Cir. 1980) (quotation omitted).

That is not to say that show-up identifications are per se constitutional, either. Certainly, "[g]reater accuracy can be assured when a suspect is exhibited to a witness in the company of others having similar facial and physical characteristics under circumstances where the mind of the beholder is not affected by intended or unintended, blatant or subtle, suggestions of the suspect's probable guilt." Smith v. Coiner, 473 F.2d 877, 880-81 (4th Cir. 1973). But, when one-man confrontations occur promptly after the commission of a crime,

the police have obtained a good description of the offender, and the show-up is completed under circumstances where it is important to continue the search for the real culprit promptly if he has not been apprehended, they are likely not suggestive. Id. at 881; see also Stanley v. Cox, 486 F.2d 48, 51 n.7 (4th Cir. 1973) (citing precedent for the proposition that a one-man, show-up identification is not impermissibly suggestive when it occurs near the time of the alleged criminal act).

The instant show-up identification was not suggestive. The show-up took place within a short time after the crime and after the police obtained a good description and the general location of Porter, leading to his arrest. There is no evidence that the witnesses influenced each other during the show-up and it is worth noting that only two of the several witnesses positively identified Porter—a factor weighing against a finding of suggestive conduct by the officers. And, although Porter was in handcuffs, this characteristic did not predominate in the identifications and did not play a conclusive role in the positive identifications, if at all.

Porter's primary thrust at oral argument was based upon the officers' decision to exclude Theodore Porter, the driver of the vehicle, from the show-up. Porter argues that by failing to also present Theodore at the show-up, the officers created an inherently suggestive show-up when they could have utilized less

12

suggestive means. Basically, Porter claims it was just as likely that Theodore Porter was the perpetrator as Theodore likewise fit the general description provided to the officers (Porter argues that Theodore, too, wore blue jeans, sneakers, and a t-shirt) and the evidence was strewn throughout the car. We disagree.

One of the arresting officers testified that "[b]ased on the information [they] had from detectives on the scene, it was readily apparent [that Kenneth Porter] was the suspect who committed the actual robbery." This determination was based upon the physical description and clothing worn by the robber. A second officer that searched Theodore Porter's person did not recall discovering anything unusual on him. A search of Kenneth Porter revealed items likely to have been used in preparation of the robbery. Too, Cammesoa Williams, the third passenger in the car, told the officers and later testified that Kenneth Porter was the only man to get out of the car and enter the liquor store. She described Kenneth as having freckles, "[a] lot of freckles," on his face, and testified that Theodore Porter had none. Our own review of the record reveals that one of the officers testified that Theodore Porter was wearing white tennis shoes, a fact directly at odds with the uniformly consistent description of the perpetrator's black, untied tennis shoes. We find no clear error given these facts. Additionally, contrary

13

to Porter's suggestion, the government bears no burden to prove that a less suggestive means could have been utilized.

B.    Reliability of Identifications

The reliability of eyewitness identifications is assessed under the totality of the circumstances.  Satcher, 126 F.3d at 566.  Here, even were we to find the show-up identification impermissibly suggestive, the identifications were nonetheless reliable.  "[R]eliability is the linchpin in determining the admissibility of identification testimony."   Manson v. Brathwaite, 432 U.S. 98, 114 (1977).  The Supreme Court has set forth five factors to be considered in determining whether a prompt identification is reliable, such that it may be admitted without violating due process: (1) the witness's opportunity to view the accused at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the accused; (4) the level of certainty by the witness at the confrontation; and (5) the length of time between the crime and confrontation.  Neil v. Biggers, 409 U.S. 188, 199-200 (1972).   All five factors tip in favor of a determination that the identifications were reliable in this case.

Both identifying witnesses had an opportunity to view Porter-one inside the liquor store and one outside.  And, even

14

though one witness saw the man she believed to be Porter in the parking lot prior to the robbery without a mask on, she was able to connect that man and the masked man she later saw walking into the liquor store with a gun because of the similarity of clothing and physical build. As to the second factor, Renfrow testified that he purposely focused on the robber so that he might later be able to positively identify the man to the police. He explained quite specifically what Porter was wearing, right down to the untied black tennis shoes Porter still had on at the time of his arrest. As to accuracy, both witnesses were detailed in their description of Porter's clothing. Renfrow testified that Porter wore the same black tennis shoes, same blue jeans, and the same tight gray shirt he saw the robber wearing. Freeman recognized Porter as the man she saw outside the liquor store and the physical description she gave police closely matched Porter's actual appearance and the clothing he was wearing when arrested. While there might have been slight inconsistencies, in all, the descriptions were "flawless in several important particulars"—namely the untied black tennis shoes, the gray shirt, the description of the coat found in the vehicle, Porter's freckles and Porter's height and build. <u>Saunders</u>, 501 F.3d at 392. The last two factors—level of certainty in the identification and time between the crime and the identification—also support a conclusion of reliability.

15

Neither witness hesitated when identifying Porter and the identifications took place very soon after the crime and Porter's arrest, which occurred only about twenty minutes after the robbery.

We therefore affirm the district court's denial of Porter's motion to suppress.

C.    In-Court Identifications

Because the show-up identifications did not violate due process principles, the subsequent in-court admission of these identifications was also not constitutionally infirm.  An out-of-court identification only taints an in-court identification if the show-up itself is unconstitutionally suggestive. Johnson, 114 F.3d at 441.  Accordingly, the identifications were properly admitted at trial.

III.

For the reasons stated herein, we affirm the district court.

AFFIRMED

16