**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 18-4296**

───────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DEMARCUS DONTE IVEY,

Defendant - Appellant.

───────────

**No. 18-4297**

───────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DEMARCUS DONTE IVEY, a/k/a Marcus Donte Ivey,

Defendant - Appellant.

───────────

Appeals from the United States District Court for the Western District of North Carolina, at Charlotte.  Max O. Cogburn, Jr., District Judge.  (3:15-cr-00245-MOC-DCK-1; 3:04-cr-00101-MOC-DCK)

───────────

Argued:  December 9, 2022                                Decided:  February 14, 2023

───────────

Before GREGORY, Chief Judge, and THACKER and RUSHING, Circuit Judges.

---

Affirmed by published opinion. Judge Thacker wrote the opinion, in which Chief Judge Gregory joined. Judge Rushing wrote an opinion concurring in part and concurring in the judgment.

---

**ARGUED:** James Patrick McLoughlin, Jr., MOORE & VAN ALLEN PLLC, Charlotte, North Carolina, for Appellant. Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** William T. Stetzer, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

---

THACKER, Circuit Judge:

Demarcus Donte Ivey ("Appellant") challenges the convictions and sentence he received after a jury found him guilty of one count of Hobbs Act robbery, in violation of 18 U.S.C. § 1951, and one count of using a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 924(c) and 924(j)(1). Although we agree with Appellant that the district court erroneously admitted certain evidence during the trial, we ultimately conclude that those errors were harmless in light of the other, properly admitted evidence. We further hold that the district court correctly instructed the jury that Hobbs Act robbery constitutes a crime of violence as that term is defined in 18 U.S.C. § 924(c)(3)(A).

Accordingly, we affirm Appellant's convictions and sentence.

## I.

## A.

We recite the facts adduced at the jury trial in this case in the light most favorable to the United States (the "Government"), as the prevailing party. *United States v. Walker*, 32 F.4th 377, 381 (4th Cir. 2022).

## 1.

Shortly before 2:00pm on Thursday, September 10, 2009, two men with guns entered Club Nikki's, a strip club in Charlotte, North Carolina.[1] One of the men was noticeably taller, wore a light gray hoodie, and carried a revolver. The other man was

---

[1] Although the incident was captured on surveillance video, and the video was admitted into evidence at the trial, the parties did not make the video -- or any other exhibits from the trial -- part of the record in this appeal.

3

smaller, wore a darker gray hoodie, and carried a semi-automatic pistol. Both men wore baggy clothes, including pants with distinctive patches.

When the men entered the club, Michael Johnson ("Johnson"), the club's day shift manager and bartender, was at the bar with Brettney Simmons ("Simmons"), one of the club's dancers. When Simmons saw the men, she ran to another area of the club and ducked down under a table because she believed she would be safer there. The smaller man then came around the bar to stand next to Johnson and demanded that Johnson give him the money from the cash register. The area near the cash register was brighter than the rest of the club, so Johnson was able to see the man's face. After getting the money from the register, the smaller man held onto Johnson's shirt and led him toward the lobby area of the club, which was also brighter than the main part of the club. Once they reached the lobby, the smaller man instructed Johnson to open the door to the club's office. At this point, Johnson and the smaller man were face-to-face, standing just a couple feet apart. When Johnson told the smaller man he did not have the code to open the door to the office, the smaller man took Johnson back inside the main part of the club and laid him down on the floor. The larger man pointed a gun at Johnson and demanded his cell phone while the shorter man went around the club telling the customers and the dancers to lie on the floor.

Both men then walked around the club taking items like keys, wallets, cell phones, and jewelry from the dancers and patrons. They took a cell phone, a wallet, and a single key on a keyring from Randy Hamilton ("Hamilton"), a patron of the club. A short time later, the larger man led Johnson behind the bar again and demanded the box of $1 bills the club kept for customers to tip the dancers. He then told Johnson to lie on the floor behind

4

the bar.  Johnson could not see anything going on in the club after that.  At one point, the club became quiet and Johnson tried to get up, but one of the men saw him and told him to lie back down.  While Johnson was lying on the floor, he heard two gunshots.

Before the first shot was fired, Hamilton heard the smaller man tell Adrian Youngblood ("Youngblood"), another patron of the club, to get on the floor "and [Youngblood] was not responding," which is when Hamilton heard a gunshot.  J.A. 1161.[2] Simmons, who had been lying on the floor near the club's entrance, stood up to see who had been shot.  She saw the smaller man in the darker hoodie bring Hamilton and Youngblood to the front of the main part of the club, near the door to the lobby.  Hamilton was sitting on the floor when the shorter man shot Youngblood again.  The bullet from the second shot entered the area of Youngblood's left shoulder and neck and lodged somewhere near his abdomen.  He was likely dead within a minute.

After the second shot, "[t]he girls started screaming in hysterics."  J.A. 1248.  The two intruders quickly left the club.  Johnson then called the police and asked one of the dancers to call the club's owner.  While Johnson was on the phone, another dancer came inside for the start of her shift and said the suspects were leaving in a green Jeep.  Although he did not see the vehicle himself, Johnson provided this information to the dispatcher.  Meanwhile, Hamilton went to the back of the club to look for a friend who had come to the club with him and saw "the tail end of a bluish green pickup backing up and pulling

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

off." *Id.* at 1172. The Jeep, the pickup, and a white sedan[3] were all identified as potential suspect vehicles in the alert sent out to law enforcement.

At 1:56pm, only two minutes after the first 911 call came in, James Stansberry ("Officer Stansberry"), a patrol officer with the Charlotte-Mecklenburg Police Department ("CMPD"), arrived at Club Nikki's and could hear people screaming inside. When he entered the main part of the club from the lobby, he could not see well and tripped over Youngblood's body at the entrance. A woman who was in the club at the time of the incident gave Officer Stansberry a description of the suspects, and Officer Stansberry informed dispatch that the suspects were in "a dark blue Ford F-150 heading northbound on I-85." J.A. 180. Officer Stansberry never saw the vehicle himself.

2.

William Secondi, Jr. ("Officer Secondi"), also a CMPD patrol officer, was sitting alone in his police car monitoring the radio traffic when he heard that a business had been robbed and someone had been shot. Dispatch described the suspects and the vehicles they could potentially be traveling in, along with the direction in which the suspects had gone. Officer Secondi set himself up to watch the traffic and was looking out for the suspects' vehicle when he saw "an older model Ford F-150" traveling at a high rate of speed and passing other traffic. J.A. 202. Officer Secondi saw the truck exit the interstate and started

---

[3] There was no testimony at trial as to the genesis of the identification of the white sedan, other than it was a part of the initial alert to law enforcement after the incident.

following it. He informed dispatch that the truck was occupied by two Black males and that the driver had a larger build and was wearing a white shirt.

After following the vehicle for a short time, Officer Secondi activated his lights and sirens, but the truck did not stop, so Officer Secondi continued pursuing it. Eventually, the truck crashed on a dead-end street, hitting a bush and "bouncing" around before hitting a vehicle parked in a residential driveway and coming to rest. J.A. 213. While the truck was "bouncing," Officer Secondi observed the passenger "hanging outside the vehicle . . . bouncing up and down inside the window frame." *Id.* When the truck hit the parked car, the passenger fell out of the truck's window, got up, and took off running toward the woods. Officer Secondi observed that the passenger was "a young [B]lack male with short hair, black shirt, about 5'8", 5'10"." *Id.* at 216. The driver, "a larger [B]lack male wearing a white shirt," exited the vehicle and ran toward Officer Secondi. *Id.* Officer Secondi got out of his cruiser and told the driver to get on the ground, but the driver "made a left between his truck and [Officer Secondi's] car" and kept running. *Id.* Officer Secondi pursued the driver on foot and was able to detain him. The driver's name was Kevin Bishop, Jr. ("Bishop"). When other patrol officers searched Bishop after his arrest, he had $23 in cash -- three $5 bills and eight $1 bills -- and three cell phones in his pockets. One of the cell phones belonged to Johnson, and another belonged to Hamilton.

The police found a revolver on the curb near the bush that the truck ran over. They did not find another gun anywhere in the area. In the grass near the driver's side of the truck, the police found a light gray hoodie. Officers also found a dark gray hoodie and a knit cap with Appellant's DNA on them on the floorboard of the truck. Appellant's DNA

7

was also located on the interior of the door on the truck's passenger side.  Inside the truck, the police found a total of $355 in cash: one $100 bill, one $50 bill, eight $20 bills, one $10 bill, four $5 bills, and 15 $1 bills.  They also found Hamilton's wallet on the floorboard.

After detaining Bishop, Officer Secondi communicated over the radio where the passenger, whom Officer Secondi described as a "Black male, black shirt, short hair or crew cut, about 5'8["], 5'10"," J.A. 219, was headed.  Daniel Cunius ("Detective Cunius"), a CMPD burglary detective who was initially on his way to Club Nikki's but "detoured" when he discovered that there was an ongoing pursuit for the suspects, heard Officer Secondi say that there had been a "jump and run."  *Id.* at 483.  Detective Cunius was familiar with the area, so he and another officer who was riding with him in his police cruiser went to a nearby neighborhood to look for the suspects.  Between 12 and 15 minutes after he heard the initial robbery call come over the radio, Detective Cunius spotted Appellant in the backyard of a house.  Appellant "was extremely out of breath, like he did something physically demanding," and "was sweating."  *Id.* at 489–90.  While his fellow officer frisked Appellant for weapons and found none, Detective Cunius communicated to dispatch at 2:08pm that Appellant had been detained.  When Officer Secondi heard that, he asked Detective Cunius to make sure the suspect "was okay" because Officer Secondi "believed the truck had struck him the way he had fallen out of the truck while it was continually bouncing."  *Id.* at 221.  Without first advising Appellant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), Detective Cunius asked Appellant if he needed medical attention, but Appellant told Detective Cunius that he did not.  Detective Cunius relayed to Officer Secondi that Appellant was not hurt.

8

Officer Secondi left Bishop with another officer and went to the location where Appellant was detained. When he arrived, Officer Secondi identified Appellant as the passenger in the pickup truck. He again asked Appellant if he was okay or had been hit by the truck. Appellant replied that he was fine and that the truck did not hit him. Appellant then asked Officer Secondi why he had been stopped, and Officer Secondi told him that the police had been looking for the truck.

Meanwhile, Caleb Komis ("Officer Komis"), another CMPD patrol officer, had been monitoring the radio traffic and was on his way to set up a perimeter to try to apprehend the suspects when he heard Detective Cunius say that he had detained someone. Officer Komis headed to the scene. Upon his arrival, Officer Komis saw that Appellant was in handcuffs. Officer Komis was designated to take Appellant to jail and was walking Appellant toward his cruiser when someone came over the radio and said that a homicide detective was needed. Appellant asked Officer Komis what that meant, but Officer Komis did not respond. Before placing Appellant in his cruiser, Officer Komis held onto Appellant while another officer searched him. Appellant had "$186 in cash, a piece of paper that had a probation officer's name and phone number on it, and an advertisement for a party, and a single vehicle key" in his pockets. J.A. 514–15. The cash consisted of four $20 bills, four $10 bills, six $5 bills, and 36 $1 bills.

3.

Instead of taking Appellant to jail right away, Officer Komis remained at the location with Appellant in the back of his cruiser so that Camila Hopkins ("Detective Hopkins"), a CMPD homicide detective, could bring witnesses from Club Nikki's for a

9

"show-up" identification of Appellant.    Detective Hopkins parked her police car perpendicular to and 20–50 feet away from Officer Komis's cruiser.  Another patrol officer brought 14 witnesses, one at a time, to the front passenger seat of Detective Hopkins's cruiser.  Detective Hopkins told each witness that the individual the witness was about to see "fits the description somehow of [an alert] that was put out of the robbery/homicide" at Club Nikki's, but she didn't know whether he was the perpetrator.  J.A. 1533.  Although she told each witness that he or she did not have to make an identification, Detective Hopkins did not ask the witnesses to describe the suspects before allowing them to observe Appellant.

When they were ready to begin, Detective Hopkins gave Officer Komis a sign, at which point Officer Komis brought Appellant, who was handcuffed, out of the back seat of his cruiser and had him "just stand there and face" Detective Hopkins's police car.  J.A. 1532.  After each witness had finished viewing him, Officer Komis placed Appellant back in the cruiser.  The show-ups took about four hours to complete.  At one point, Appellant asked Officer Komis "why we were doing all this when all he did was run from the truck." *Id.* at 518.  Officer Komis responded that the police "were conducting an investigation and that was all [he] could tell [Appellant]." *Id.*

Of the 14 witnesses, 12 could not identify Appellant.  But Johnson and Simmons both identified Appellant as one of the perpetrators of the incident at Club Nikki's.  Johnson told Detective Hopkins that Appellant "looked like" the smaller of the two perpetrators, "the guy that was in [Johnson's] face earlier." J.A. 1321.  Simmons identified Appellant as "[t]he shooter from the club." *Id.* at 1408.  She recognized Appellant from his "left side"

because Officer Komis "made him turn sideways" so that Simmons could look at him. *Id.* Detective Hopkins recorded Johnson and Simmons making a positive identification immediately after they viewed Appellant. However, she did not ask Johnson and Simmons how sure they were that they had correctly identified Appellant as one of the perpetrators. She also did not record any of the 12 witnesses who did not identify Appellant.

4.

After the show-ups were completed, Officer Komis took Appellant to police headquarters. Michael Burke ("Detective Burke"), a CMPD homicide detective, reviewed the items that had been confiscated from Appellant's pockets when he was arrested. Detective Burke returned several of those items to Appellant, including a business card and "a single key on a ring," J.A. 580, because at the time Detective Burke "did not believe they had any evidentiary value," *id.* at 583. The business card had the name and contact information for a state probation officer named Roxanne Frempong ("Frempong") and an appointment time for "Thursday at 3:00." *Id.* at 582. Frempong supervised Youngblood, the victim who was shot and killed at Club Nikki's, between May and November 2008. On Thursday, August 28, 2008, Frempong had an appointment with Youngblood at 3:00pm. Youngblood had other information relating to Frempong in his pockets at the time of his death. Frempong was also Bishop's probation officer and had last seen Bishop on September 8, 2009, two days before the incident at Club Nikki's. However, there was never a scheduled meeting between Bishop and Frempong on a Thursday at 3:00pm.

11

B.

On October 20, 2015, Appellant was indicted by a federal grand jury on one count of Hobbs Act robbery, in violation of 18 U.S.C. § 1951 ("Count One"), and one count of using a firearm in furtherance of the crime of violence described in Count One, resulting in death, in violation of 18 U.S.C. §§ 924(c) and 924(j)(1) ("Count Two"), stemming from his involvement in the incident at Club Nikki's.  Following a jury trial, Appellant was found guilty of both counts charged in the indictment and sentenced to 240 months of imprisonment on Count One and life imprisonment on Count Two, running consecutively.

Appellant timely appealed his convictions and sentence.

II.

Appellant raises several evidentiary challenges in this appeal.  First, he argues that the district court erroneously denied his pretrial motion to suppress Johnson's and Simmons's identifications of him as one of the perpetrators of the incident at Club Nikki's as well as the incriminating statements Appellant made after the police apprehended him. He also argues that the district court erred by permitting Detective Burke to testify about the contents of the business card found in Appellant's pocket at the time of his arrest.  We agree with Appellant that some of this evidence was improperly admitted.  But we hold that the errors were harmless in light of the other admissible evidence the jury heard during the trial and that the cumulative error doctrine likewise does not merit reversal.

Appellant further argues that the district court erred by excluding testimony from Appellant's proffered expert witness.  We hold that Appellant waived this challenge by affirmatively withdrawing the witness at trial.

12

A.

We begin with the district court's denial of Appellant's motion to suppress. "When reviewing a district court's denial of a motion to suppress, we review legal conclusions de novo and any factual determinations only for clear error." *United States v. Barronette*, 46 F.4th 177, 195 (4th Cir. 2022).

1.

Appellant argues that the district court should have suppressed evidence relating to the show-ups during which Johnson and Simmons identified him as one of the perpetrators of the incident at Club Nikki's. "Due process principles prohibit the admission at trial of an out-of-court identification obtained through procedures 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *United States v. Saunders*, 501 F.3d 384, 389 (4th Cir. 2007) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). "Yet even where unnecessarily suggestive procedures are used, due process does not require exclusion of the evidence if the 'identification was sufficiently reliable to preclude the substantial likelihood of misidentification.'" *United States v. Saint Louis*, 889 F.3d 145, 152 (4th Cir. 2018) (quoting *United States v. Johnson*, 114 F.3d 435, 442 (4th Cir. 1997)).

a.

To determine whether identification testimony is admissible, we first evaluate whether the defendant has demonstrated that the "identification procedure was impermissibly suggestive," and if he has, then we "consider[] whether the identification was nevertheless reliable in the context of all the circumstances." *Saunders*, 501 F.3d at

13

389–90. We conclude that the procedure used during the show-ups in this case was impermissibly suggestive and that the identifications were not sufficiently reliable. Therefore, we hold that the identifications should not have been admitted into evidence.

"A procedure is unnecessarily suggestive if a positive identification is likely to result from factors other than the witness's own recollection of the crime." *United States v. Greene*, 704 F.3d 298, 306 (4th Cir. 2013) (quoting *Satcher v. Pruett*, 126 F.3d 561, 566 (4th Cir. 1997)). That is true of the show-ups in this case. Appellant was the only individual that the witnesses viewed during the show-ups, and he was handcuffed and emerged from the back of a police cruiser while the witnesses watched. While each of those circumstances, on its own, may not constitute a due process violation, taken together, they are highly suggestive of Appellant's guilt. On top of that, without first asking the witnesses to describe the perpetrators prior to their viewing Appellant, Detective Hopkins told the witnesses that Appellant fit the description of someone involved in the incident at Club Nikki's. The Government emphasizes that Detective Hopkins also told the witnesses that Appellant was not necessarily one of the perpetrators and that the witnesses were not obligated to make a positive identification. However, in this case, those admonishments were not enough to overcome the strong inference of guilt -- and the corresponding risk of misidentification -- resulting from the other circumstances of the show-ups. And contrary to the Government's assertion, the fact that the majority of the witnesses were not swayed to identify Appellant under these circumstances does not detract from the suggestiveness of the procedure used.

14

b.

When faced with a suggestive out-of-court identification, we next evaluate the reliability of that identification:

> considering the totality of the circumstances, including factors such as: (1) "the opportunity of the witness to view the criminal at the time of the crime"; (2) "the witness'[s] degree of attention"; (3) "the accuracy of the witness'[s] prior description of the criminal"; (4) "the level of certainty demonstrated by the witness at the confrontation"; and (5) "the length of time between the crime and the confrontation."

*Saint Louis*, 889 F.3d at 153 (quoting *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972)). "We weigh these factors against 'the corrupting effect of the suggestive identification itself,' keeping in mind that 'the exclusion of such evidence is the exception to the rule that favors the admissibility of eyewitness identification for the jury's consideration.'" *Id.* (internal citation omitted).

Although Johnson's and Simmons's identifications of Appellant as one of the perpetrators of the incident at Club Nikki's had some indicia of reliability, on the whole, those identifications were not sufficiently reliable to withstand the suggestiveness of the show-ups. For instance, Johnson had a good opportunity to see the individual who stood only a few feet away from him in the two most brightly lit areas of the club. But when he was asked to describe that individual during an interview after the show-ups had taken place, Johnson told the police that the individual was wearing a black t-shirt. According to the surveillance video of the incident, the perpetrators were wearing hoodies. However, Appellant wore a black t-shirt at the time of the show-ups, indicating that Johnson's

15

memory of the incident was influenced by his viewing of Appellant during the show-ups. That raises a significant question about the reliability of Johnson's identification of Appellant.

Simmons, on the other hand, had less of an opportunity to see the perpetrators than Johnson because she observed the incident from across the club and was never in close proximity to the perpetrators. Although she told Detective Hopkins during the show-ups that Appellant "looked exactly like the shooter," J.A. 1557, Simmons could not identify Appellant until she saw a side profile. Simmons was also inconsistent about seeing the right or left side of the shooter's body during the incident. This inconsistency cuts against the reliability of her identification.

Moreover, because Detective Hopkins did not even ask the witnesses to describe the perpetrators before viewing Appellant or ask Johnson and Simmons how certain they were in their identifications, those indicia of reliability are missing in this case. In that manner, the reliability of the identifications is inextricably intertwined with the suggestiveness of the procedure used during the show-ups. That makes this case markedly distinguishable from the one cited by the Government, *United States v. Saunders*, 501 F.3d 384 (4th Cir. 2007).

In *Saunders*, not only did the witness have "a sufficient opportunity to observe [the defendant] and to form a reliable recollection of what he looked like," the witness's description of the suspect "was flawless in several important particulars," and he "did not hesitate when selecting [the defendant's] photo" from a six-photo array shown to him two hours after the robbery. 501 F.3d at 392. This, combined with the other evidence

16

connecting the defendant to the robbery in *Saunders*, made the witness's identification reliable despite the suggestive photo array. *Id.* at 393. In this case, by contrast, Detective Hopkins's failure to ask the witnesses two of the most important questions guiding our reliability analysis prevents us from determining that Johnson's and Simmons's identifications of Appellant were reliable. Additionally, Detective Hopkins failed to record the identifications until after Johnson and Simmons initially made them. And, notably, she did not record the 12 witnesses who did not identify Appellant at all. This is suspect, to say the least, and adds to the unreliability of the identifications.

Further, the show-ups were not conducted within the immediate aftermath of the incident at Club Nikki's but rather took place over several hours. Johnson and Simmons were two of the last people to view Appellant during the show-ups, so their memories of the incident could not have been as fresh as they had been earlier in the afternoon.

In sum, the totality of the circumstances fails to establish that Johnson's and Simmons's identifications were sufficiently reliable despite the suggestiveness of the procedure used during the show-ups. The district court should not have permitted testimony about those identifications.

c.

Nonetheless, the district court's error was harmless. "An error is harmless when it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *United States v. Collins*, 982 F.3d 236, 243 (4th Cir. 2020) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). "The burden rests on the government, the beneficiary of the error, to show harmlessness." *United States v. Garcia-Lagunas*, 835

17

F.3d 479, 488 (4th Cir. 2016).  The Government has met that burden in this case by providing overwhelming evidence of Appellant's involvement in the incident at Club Nikki's.  Officer Stansberry arrived at the club within five minutes of the first 911 call and obtained a description of the perpetrators and a number of potential vehicles which they could have used to flee the scene.  Officer Secondi spotted a vehicle on the interstate nearby, which fit one of the descriptions and which was traveling at a high rate of speed. He followed the truck until it crashed.  Appellant, who was the passenger in the truck, ran and was apprehended shortly afterward.  All of this took place within 15 minutes of the incident at Club Nikki's.

Additionally, in and around the truck and on Appellant's and Bishop's persons, the police found cash, including a significant number of $1 bills; hoodies similar to the ones the suspects were described to be wearing, one of which had Appellant's DNA on it; a revolver; and two cell phones and a wallet taken from people who were at Club Nikki's during the incident.  Appellant was also noted to be smaller than Bishop in height and in stature, and the smaller of the two perpetrators was the shooter according to the surveillance video from the club and the eyewitnesses' testimony.  The clothes Appellant was wearing at the time of his arrest -- particularly the distinctive markings on his jeans -- also looked similar to those worn by the smaller man in the surveillance video.  Therefore, we conclude that Johnson's and Simmons's identifications of Appellant as one of the perpetrators did not unduly influence the jury's guilty verdict on either count, as the verdict was otherwise supported by overwhelming evidence.

18

2.

Appellant also argues that the district court should have suppressed the purportedly incriminating statements he made to the officers who apprehended him after he fled from the scene of the crash, before he had been advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Specifically, Appellant challenges the admission of his responses to Detective Cunius's and Officer Secondi's questions about whether he needed medical attention or was hit by the truck. Appellant also challenges the admission of his question to Officer Secondi about why he was stopped and his questions to Officer Komis about what it meant to need a homicide detective and "why [the police] were doing all this when all he did was run from the truck." J.A. 518.

An incriminating statement "made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and the defendant knowingly, intelligently, and voluntarily waives those rights." *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017) (quoting *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012)). Importantly, "[c]oncerns under *Miranda* only arise when a defendant is in custody and subjected to interrogation." *Id.* "'[I]nterrogation' includes not only 'express questioning' but also its 'functional equivalent' -- 'words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Grueninger v. Dir., Va. Dep't of Corr.*, 813 F.3d 517, 527 (4th Cir. 2016) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980)).

Appellant's own questions to the officers after he was apprehended were clearly not made in response to interrogation. "The Supreme Court made clear in *Miranda* that '[b]y custodial interrogation, [it] mean[t] questioning initiated *by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *United States v. Kimbrough*, 477 F.3d 144, 147 (4th Cir. 2007) (quoting *Miranda*, 384 U.S. at 444) (emphasis in original). "[S]pontaneous or volunteered statements that are not the product of interrogation or its functional equivalent are not barred by *Miranda*, even if the defendant is in custody when the statements are made." *United States v. Williams*, 16 F. App'x 90, 92 (4th Cir. 2001) (per curiam). The district court correctly concluded that Appellant's questions to the officers about why they stopped him, what it meant that a homicide detective was needed, and "why [they] were doing all this when all he did was run from the truck," J.A. 518, were unprompted by questioning from the officers and thus did not require a *Miranda* warning. For example, Appellant asked why he was stopped when the officers had him detained and were speaking amongst themselves, not to him. And he asked the other questions at random points during his arrest and the show-ups, not in response to any questioning by Officer Komis. Plainly, no interrogation was taking place. Therefore, *Miranda* was not implicated.

Officer Secondi's questions to Appellant about whether he was hit by the truck or needed medical attention are a closer call. The district court found that Officer Secondi was genuinely concerned for Appellant's welfare and truly believed that Appellant had been hit by the truck after he fell out of the window when the truck crashed. However, as Appellant points out, Officer Secondi already knew that Appellant did not need medical

20

attention because Detective Cunius had asked him that question and relayed Appellant's answer to Officer Secondi. Yet, upon arriving at the location where Detective Cunius had apprehended Appellant, Officer Secondi still asked Appellant if the truck had hit him. Given those circumstances, it would be reasonable to conclude that Officer Secondi aimed to get Appellant to incriminate himself.

Even so, any error the district court made by admitting Appellant's response to Officer Secondi's question into evidence was harmless because there was plenty of other evidence connecting Appellant to the truck, including Appellant's own question about why he had to participate in the show-ups "when all he did was run from the truck." J.A. 518. In addition, Officer Secondi recognized Appellant as the passenger who was hanging out the window of the truck during the chase, and Appellant's DNA was found inside the truck and on the dark gray hoodie and the knit cap that were on the floorboard. Thus, it is unlikely that the admission of Appellant's response to Officer Secondi's question about whether Appellant had been hit by the truck affected the verdict in this case.

B.

Appellant asserts that the district court violated the "best evidence rule," Federal Rule of Evidence 1002, by permitting Detective Burke to testify about the contents of the business card that was found in Appellant's pocket after his arrest. We review the district court's admission of this evidence over Appellant's objection for abuse of discretion. *United States v. Arce*, 49 F.4th 382, 395 (4th Cir. 2022).

The best evidence rule provides that when a party seeks "to prove [the] content" of a "writing, recording, or photograph," it must do so with the original. Fed. R. Evid. 1002.

21

The Government does not argue that the business card is not a "writing, recording, or photograph" subject to the rule, nor does the Government contend that it did not seek to prove the card's content by eliciting Detective Burke's testimony at trial. Rather, the Government argues that one or more exceptions to the best evidence rule apply here.

A party may introduce "other evidence of the content of a writing, recording, or photograph" in one of four circumstances: (1) "all the originals are lost or destroyed, and not by the proponent [of the evidence] acting in bad faith"; (2) "an original cannot be obtained by any available judicial process"; (3) "the party against whom the original would be offered had control of the original[ and] was put on notice . . . that the original would be a subject of proof at the trial" but "fails to produce it at the trial"; and (4) "the writing, recording, or photograph is not closely related to a controlling issue." Fed. R. Evid. 1004. The district court did not make a specific determination that one of these exceptions applied. Instead, when defense counsel objected to the introduction of Detective Burke's testimony about the business card "on the grounds that the best evidence would be the card itself," the district court simply asked, "Do we have the card here?" J.A. 581. When counsel for the Government replied in the negative, the district court overruled Appellant's objection without further elaboration.

We agree with Appellant that the district court erroneously overruled his objection solely because the business card was not present in the courtroom and that this is not equivalent to a finding that the original card was lost or destroyed or that any of the other exceptions applied. The proponent of the evidence bears the burden to show that one of the exceptions to the best evidence rule applies. *See Nicholas v. Wal-Mart Stores, Inc.*, 33

22

F. App'x 61, 68 (4th Cir. 2002) (per curiam). And when the proponent asserts that an original may have been lost or destroyed, the proponent "must demonstrate to the satisfaction of the court that although [the original] once existed, it cannot be found despite a diligent and unsuccessful search and that there is no reasonable probability that it has been designedly withheld or suppressed." *Sellmayer Packing Co. v. Comm'r*, 146 F.2d 707, 710 (4th Cir. 1944). The Government did not endeavor to do this, nor did the district court require it to before overruling Appellant's objection. This was an abuse of discretion.

However, here, too, the district court's error in admitting the testimony was harmless because the jury heard substantial other evidence connecting Appellant to the incident at Club Nikki's. Even without the business card, the Government presented a plethora of evidence that Appellant was one of the perpetrators involved in the incident at the club. For example, Hamilton testified that he saw a dark blue pickup truck leaving the club in the minutes after the incident. Officer Secondi spotted the truck on the interstate traveling at a high rate of speed and followed it until it crashed. A hoodie and a knit cap with Appellant's DNA on them were found inside the truck. The jeans Appellant was wearing when he was arrested had distinctive markings that were similar to those on the pants worn by the smaller suspect on the surveillance video. Officer Secondi identified Appellant as the truck's passenger, and Appellant's DNA was on the interior passenger side of the truck. Indeed, Appellant himself indicated that he had "run from the truck." J.A. 518. Police also found Hamilton's wallet inside the truck, and Bishop had Hamilton's and Johnson's cell phones in his pockets when he was arrested. A total of $355, including 15 $1 bills, was found inside the truck, and Appellant had $186, including 36 $1 bills, in

23

his pockets at the time of his arrest. Clearly, the jury's guilty verdict did not depend on the business card.

C.

Notwithstanding that these evidentiary errors committed by the district court were harmless, Appellant argues that the cumulative error doctrine warrants reversal. "Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Runyon*, 707 F.3d 475, 520 (4th Cir. 2013) (quoting *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009)). The cumulative error doctrine applies when "such errors . . . so fatally infect the trial that they violated the trial's fundamental fairness." *Id.* (quoting *Basham*, 561 F.3d at 330).

In cases like this one, where "the strength of the government's evidence leaves little doubt that the jury would have returned guilty verdicts irrespective of the identified errors," reversal pursuant to the cumulative error doctrine is inappropriate. *United States v. Woods*, 710 F.3d 195, 209 (4th Cir. 2013). And there was sufficient evidence for the jury to convict Appellant on both counts even if the erroneously admitted evidence had been excluded.[4] Therefore, for largely the same reasons as we deem the district court's errors harmless, the cumulative error doctrine has no application here. *See Basham*, 561 F.3d at 330 ("When

---

[4] That Appellant was acquitted of his state charges arising from the incident at Club Nikki's is of no moment, as we focus on the evidence presented at the federal trial. *See United States v. Ricks*, 882 F.2d 885, 889–90 (4th Cir. 1989) (holding that defendant's state court acquittal "does not bar reconsideration of a factual issue presented in that [state court] case in a subsequent federal prosecution for different offenses").

none of the individual rulings work any cognizable harm, it necessarily follows that the cumulative error doctrine finds no foothold." (alterations adopted and internal quotation marks omitted)).

D.

Appellant also argues that the district court erred by excluding expert testimony he offered to challenge the reliability of Johnson's and Simmons's identifications of Appellant as the shooter from Club Nikki's. We generally review the exclusion of expert testimony for abuse of discretion. *Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476, 480 (4th Cir. 2018). However, in this case, Appellant clearly waived his right to assert this argument on appeal by withdrawing the expert as a witness before the district court made a final ruling to exclude the testimony.

At trial, Appellant sought to introduce expert testimony from optometrist Dr. Paul Michel ("Dr. Michel") on the issue of eyewitness identification. The Government moved to exclude the evidence, and after hearing argument from both sides and testimony about Dr. Michel's qualifications, the district court "conditionally" excluded the testimony. J.A. 1639. The district court told the parties that Dr. Michel could "come back in and testify fully about what he's going to say when the jury is not here . . . and then [the district court would] make a final decision on this." *Id.* at 1640. However, later that afternoon, before the district court had a chance to hear further from Dr. Michel, Appellant's counsel informed the district court, "we have elected not to try to get Dr. Michel's testimony in," and asked to release him from his subpoena. *Id.* at 1700. The district court then confirmed

25

*twice* that Appellant was withdrawing Dr. Michel as a witness, and both times, defense counsel answered in the affirmative:

> THE COURT: Eyewitness identification. So you're withdrawing him as a witness.
>
> [Appellant's counsel]: Yes, Your Honor.
>
> THE COURT: All right. No, as long as you're withdrawing him. Because otherwise, I've got to make a record of what he would say.
>
> [Appellant's counsel]: We're withdrawing him, yeah.
>
> THE COURT: All right. Thank you. Then yes, he's released.

*Id.* at 1700–01.

"A 'waiver is the intentional relinquishment of a known right.'" *United States v. Robinson*, 744 F.3d 293, 298 (4th Cir. 2014) (quoting *Wood v. Milyard*, 566 U.S. 463, 474 (2012)). "Criminal defendants may waive statutory or constitutional rights -- including the right to challenge a particular ruling on appeal -- if the waiver is knowing and voluntary." *Id.* Appellant does not argue that the waiver in this case was not knowing and voluntary. Instead, he contends that the district court's ruling was not, in fact, preliminary because the district court "made clear absent extraordinary circumstances it would not admit the testimony of the expert." Appellant's Reply Br. at 6. That is simply not accurate. Although the district court did express doubt about the necessity of Dr. Michel's expert testimony, the district court nonetheless explained that it would wait to hear more from Dr. Michel before definitively ruling to exclude his testimony. But before the district court

26

had that opportunity, Appellant's counsel asked that Dr. Michel be released from his subpoena because the defense did not plan to introduce him as an expert witness. This is waiver. *See Robinson*, 744 F.3d at 298 ("A party who identifies an issue, and then explicitly withdraws it, has waived the issue." (quoting *United States v. Rodriguez*, 311 F.3d 435, 437 (1st Cir. 2002))). And "when a claim is waived, it is not reviewable on appeal, even for plain error." *Id.*

### III.

Lastly, Appellant contends that the district court erred by instructing the jury that Hobbs Act robbery qualifies as a "crime of violence" as that term is defined in 18 U.S.C. § 924(c)(3)(A). "We review de novo the question whether an offense qualifies as a crime of violence." *United States v. Mathis*, 932 F.3d 242, 263 (4th Cir. 2019). However, "when, as in this case, a party fails to object to [a jury] instruction . . . we review for plain error." *United States v. Alvarado*, 816 F.3d 242, 248 (4th Cir. 2016) (internal quotation marks omitted).

The district court properly instructed the jury in this case. The term "crime of violence," as it is used in 18 U.S.C. § 924(c), is defined as "an offense that is a felony and . . . has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A).[5] At the time the district court

---

[5] The definition of "crime of violence" also includes a felony offense "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(B). However, this "residual clause" is "unconstitutionally vague" and therefore invalid. *United* (Continued)

instructed the jury, we had already held in *United States v. Mathis* "that Hobbs Act robbery constitutes a crime of violence under [§ 924(c)(3)(A)]." 932 F.3d 242, 266 (4th Cir. 2019). The district court's instruction was consistent with that holding.

Appellant nonetheless suggests that our holding in *Mathis* has been undermined by the Supreme Court's more recent decision in *Borden v. United States*, 141 S. Ct. 1817 (2021). To that end, "we need not follow precedent by a panel . . . if the decision rests on authority that subsequently proves untenable considering Supreme Court decisions." *United States v. Banks*, 29 F.4th 168, 175 (4th Cir. 2022) (internal quotation marks omitted). "Authority is untenable if its reasoning or holding is inconsistent with a Supreme Court decision." *Id.*

In *Borden*, the Supreme Court held that the definition of "violent felony" in the Armed Career Criminal Act, 18 U.S.C. § 924(e), does not include offenses that criminalize reckless conduct because those offenses "do not require . . . the active employment of force against another person." 141 S. Ct. at 1834. The portion of the "violent felony" definition that the Supreme Court was considering in *Borden* is almost identical to the definition of "crime of violence" in § 924(c)(3)(A), in that a "violent felony" is a felony offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i). Therefore, it follows that if Hobbs Act

---

*States v. Davis*, 139 S. Ct. 2319, 2336 (2019). Accordingly, to qualify as a "crime of violence," Hobbs Act robbery must meet the definition in § 924(c)(3)(A).

robbery can be committed recklessly, *Borden* would undermine our holding in *Mathis* that Hobbs Act robbery is a crime of violence.

But Hobbs Act robbery cannot be committed recklessly. Hobbs Act robbery is defined as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property." 18 U.S.C. § 1951(b)(1). Appellant argues that Hobbs Act robbery can be committed recklessly because there is no intent element in the statutory definition. But when the statutory text "is silent concerning the *mens rea* required for a violation," we rely on "the common-law rule requiring *mens rea*" to imply an intent element into the statute, unless "some indication of congressional intent" counsels against it. *Staples v. United States*, 511 U.S. 600, 605–06 (1994). "The presumption in favor of scienter requires [us] to read into a statute only that *mens rea* which is necessary to separate wrongful conduct from 'otherwise innocent conduct.'" *Carter v. United States*, 530 U.S. 255, 269 (2000) (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)). Usually, this is "a general intent requirement" -- "*i.e.*, proof of knowledge with respect to the *actus reus* of the crime." *Id.* We agree with several of our sister circuits that this presumption means that Hobbs Act robbery cannot be committed recklessly but instead requires intentional conduct. *See, e.g.*, *United States v. Dominguez*, 954 F.3d 1251, 1261 (9th Cir. 2020) (quoting *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999)), *overruled on other grounds by United States v. Taylor*, 142 S. Ct. 2015 (2022); *United States v. García-Ortiz*, 904 F.3d 102, 108–09 (1st Cir. 2018); *United States v. Gray*, 260 F.3d 1267, 1283 (11th Cir. 2001). Therefore, the Supreme Court's decision

in *Borden* did not render untenable our holding in *Mathis* that Hobbs Act robbery qualifies as a "crime of violence" pursuant to § 924(c)(3)(A).

Appellant further argues that the "fear of injury" portion of the Hobbs Act robbery definition does not align with the definition of "crime of violence" because, according to Appellant, "putting someone in fear of injury . . . does not require an intentional threat of physical force." Appellant's Opening Br. at 42. But *Mathis* also forecloses this argument. In *Mathis*, we explained that the phrase "fear of injury" as used in the Hobbs Act robbery definition is equivalent to the federal bank robbery statute's definition of "intimidation," which "necessarily 'involves the threat to use [physical] force'" and therefore comes within the meaning of "crime of violence" in § 924(c)(3)(A). 932 F.3d at 266 (quoting *United States v. McNeal*, 818 F.3d 141, 153 (4th Cir. 2016)) (alteration in original). Even if we agreed with Appellant that we reached an incorrect conclusion in *Mathis*, we "cannot overrule a decision issued by another panel." *Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021) (quoting *McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (en banc)) (emphasis deleted). Therefore, despite Appellant's argument to the contrary, committing Hobbs Act robbery by "fear of injury" involves the threatened use of force and is a "crime of violence" as that term is defined in § 924(c)(3)(A).

The district court's jury instruction was not erroneous.

## IV.

For the foregoing reasons, we affirm Appellant's convictions and sentence.

*AFFIRMED*

RUSHING, Circuit Judge, concurring in part and concurring in the judgment:

I agree with the majority that every evidentiary ruling of which Ivey complains—individually and considered cumulatively—was harmless in light of the overwhelming evidence of his guilt. I write separately because I am not convinced that the show-up identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *United States v. Saint Louis*, 889 F.3d 145, 152 (4th Cir. 2018) (citing *Neil v. Biggers*, 409 U.S. 188, 198 (1972)).

"A procedure is unnecessarily suggestive if a positive identification is likely to result from factors other than the witness's own recollection of the crime." *Satcher v. Pruett*, 126 F.3d 561, 566 (4th Cir. 1997). We have repeatedly held that "[p]rompt, on the scene show-ups are not per se suggestive and may in fact 'promote fairness, by enhancing reliability of the identifications, and permit expeditious release of innocent subjects.'" *United States v. Adoma*, 781 Fed. App. 199, 204–205 (4th Cir. 2019) (quoting *Willis v. Garrison*, 624 F.2d 491, 494 (4th Cir. 1980)); *United States v. Porter*, 338 Fed. App. 300, 304 (4th Cir. 2009); *United States v. Wilson*, 210 Fed. App. 263, 265–266 (4th Cir. 2006); *see also Norris v. Slayton*, 540 F.2d 1241, 1243 (4th Cir. 1976); *Stanley v. Cox*, 486 F.2d 48, 50–51 & n.7, 53–55 (4th Cir. 1973); *cf. Johnson v. Riddle*, 562 F.2d 312, 315 (4th Cir. 1977). Of course, some show-ups are suggestive, so we assess the circumstances of each case to determine whether the procedure used was so impermissibly suggestive as to create a very substantial likelihood of misidentification.

Here, officers began bringing witnesses to view Ivey in person promptly upon capturing him, less than two hours after the robbery and murder at Club Nikki's. *Cf.*

31

*Simmons v. United States*, 390 U.S. 377, 385, 386 n.6 (1968) (noting that witnesses' "memories were still fresh" one day after bank robbery and that "a corporeal identification" is "normally more accurate" than a photographic one); *Adoma*, 781 Fed. App. at 205 (reasoning that "a show-up was important to search for the real culprit promptly" when shots had been fired during an armed robbery). Officers brought 14 witnesses to view Ivey one by one. Each viewed him with only Detective Hopkins present and without knowing if any other witness had made an identification. While this procedure prolonged the show-up, it also increased its reliability. It eliminated the possibility that witnesses would influence each other and decreased any sense of pressure from law enforcement officers to make an identification.

Detective Hopkins gave each witness instructions that mitigated the potential suggestiveness of the show-up. At the pre-trial suppression hearing, Hopkins testified that she told the witnesses "[t]hat the person that they're going to view here in a moment may or may not be the person involved. That it was important for them to not feel as if they had to make an identification. That it was just as important to eliminate someone that was, you know, innocent as to identify somebody that was the perpetrator." J.A. 100. She explained, "What's going to happen is this officer is going to step this individual out. And if you recognize that individual, tell me how it is that you recognize that individual." J.A. 112. At trial, Detective Hopkins testified that she said things like "this individual is being detained because we can't move him. He fits the description somehow of a BOLO [(be-on-the-lookout)] that was put out of the robbery/homicide. And I don't know whether this is the suspect or not. I don't know whether it's the suspect or not. If you make an

32

identification, fine. If you don't, fine." J.A. 1533. On cross-examination, she stated that she told the witnesses that "[t]he person being detained fits some portion of the BOLO." J.A. 1543.

As the majority notes, when the witnesses viewed Ivey, he was wearing handcuffs and exiting a police car with a uniformed officer. These circumstances increase the suggestiveness of the procedure. *But see Porter*, 338 Fed. App. at 302, 305 (holding show-up identification was not suggestive even though defendant was in handcuffs and accompanied by officers). But Detective Hopkins's instructions provided the witnesses with an explanation of these circumstances that was consistent with Ivey's possible innocence. The show-up was conducted in public shortly after the crime, giving the correct impression that police were seeking the witnesses' input *before* taking Ivey to the police station. This scene corroborated Detective Hopkins's caution to the witnesses that the officers did not know whether Ivey was the right man and that ruling out possible suspects was just as important as identifying the perpetrator. We have previously found that similar instructions mitigated a suspect's detention during a show-up and supported a conclusion that the procedure was not impermissibly suggestive. *See Adoma*, 781 Fed. App. at 205.

Indeed, we know Detective Hopkins's instructions were effective because only four of the fourteen witnesses positively identified Ivey (two of whom testified at trial). As we have previously reasoned, this "factor weigh[s] against a finding of suggestive conduct by the officers." *Porter*, 338 Fed. App. at 305. And both Johnson and Simmons qualified their identifications, suggesting that they were not unduly influenced to make a positive identification based on anything other than their own recollections of the crime. Because

33

34

this show-up procedure, considered as a whole, was not impermissibly suggestive, any "potential for misidentification" was properly "left for testing 'by a course of cross-examination at trial.'" *United States v. Saunders*, 501 F.3d 384, 389 n.1 (4th Cir. 2007) (quoting *Simmons*, 390 U.S. at 384); *see Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) ("Short of" a "very substantial likelihood of irreparable misidentification," "[w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill." (internal quotation marks omitted)).