**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-4054**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JACOB DAYLEN ROSS, a/ka/ Jake, a/ka/ Timneals207@gmail.com, a/k/a Jacobross292@gmail.com,

Defendant - Appellant.

---

Appeal from the United States District Court for the United States District Court for the Western District of North Carolina, at Asheville.  Martin K. Reidinger, Chief District Judge.  (1:20-cr-00064-MR-WCM-1)

---

Argued:  March 22, 2023                    Decided:  June 30, 2023

---

Before GREGORY, Chief Judge, DIAZ, and THACKER, Circuit Judges.

---

Affirmed by published opinion.  Chief Judge Gregory wrote the opinion, in which Judge Diaz and Judge Thacker concurred.

---

**ARGUED:**  Geoffrey Ryan Willis, DYSART WILLIS, Raleigh, North Carolina, for Appellant.  Anthony Joseph Enright, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.  **ON BRIEF:**  Christian E. Dysart, DYSART WILLIS, Raleigh, North Carolina, for Appellant.  Dena J. King, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

GREGORY, Chief Judge:

Jacob Daylen Ross was convicted of producing and possessing child pornography in violation of 18 U.S.C. § 2251(a) and 18 U.S.C. § 2252A, respectively, and sentenced to fifty-five years in prison. On appeal, Ross argues that the district court erred by identifying him for a key government witness, Sosha Peters, after Peters was initially unable to make the in-court identification herself. Ross also contends that his sentence was grossly disproportionate to his offenses in violation of the Eighth Amendment. Finding no reversible error, we affirm the district court's judgment.

I.

A.

In June 2020, the McDowell County, North Carolina Sheriff's Office ("MCSO") received a report from Sosha Peters, who claimed that Jacob Ross might be sexually abusing children. Peters showed MCSO text messages she had exchanged with a phone number she said belonged to Ross (the "2873 number"), which appeared to corroborate her allegations. Based on that information, MCSO obtained a search warrant for the phone records for the 2873 number. The responsive records showed that the number was registered to Ross Skid Products. Ross's parents owned that company, and Ross himself worked there.

On June 24, officers conducted a traffic stop of Ross's car based on an outstanding, unrelated arrest warrant. Following the stop, Ross consented to a search of a cell phone in his possession (the "8434 number"). MCSO discovered a photograph of a "very young"

2

girl's genitalia on the phone. J.A. 116–17. MCSO then seized the phone and performed a forensic extraction, which revealed several additional images of child pornography. Pursuant to a search warrant, MCSO obtained the subscriber information for the 8434 number, which showed that this phone, like the 2873 number, was registered to Ross Skid Products. MCSO also secured search warrants for three Google Mail accounts it had discovered while searching the phone.[1] The records Google provided revealed that each account was connected to one or both of the Ross Skid Products phone numbers. Two of the accounts were registered to "Jacob Ross," and the third under the name "Tim Neals." The data Google provided for the "Tim Neals" account contained a "selfie" photograph of Ross. J.A. 313.

MCSO shared the seized cell phone and the Google account records with the U.S. Department of Homeland Security's Homeland Security Investigations Division ("HSI"), which continued the investigation. James Brown, a computer forensic analyst for HSI, conducted a more extensive forensic extraction of the seized phone, which uncovered a total of twenty-eight images of child pornography involving young children. Many of the images were screenshots of video calls on WhatsApp, a messaging and video-call platform. The data associated with the WhatsApp images indicates that they were taken on June 8 and June 16, 2020. Because they are screenshots from video calls, they include an image of the caller in a small window in the lower right-hand corner of the screen. In some, that

---

[1] In addition, MCSO obtained and executed a search warrant for an office building and adjoining apartment owned by Ross Skid Products, as well as a cabin Ross owned, both of which were located in Marion, North Carolina. The searches of those properties did not uncover any incriminating evidence.

corner image depicts a man, whose face is not visible, either receiving oral sex from a woman or exposing himself. The screenshots also indicate that the WhatsApp user who made the calls—the user shown in the lower-right corner—went by the username "Jake."

Brown also extracted data from the WhatsApp application on the seized cell phone, including several WhatsApp text logs. The username for the WhatsApp profile on the phone was "Jake," and the profile was connected to the 2873 number.[2] The text logs included messages between Jake and a woman in the Philippines named Analyn Tuanda Alcaraz, whose WhatsApp username was "Happy." Several text messages show Jake directing Alcaraz to pose a child referred to as "Princess" in sexually explicit ways and to sexually molest the child. J.A. 265. Some of those same messages appear in the background of pornographic screenshots from the video calls.

In other WhatsApp text exchanges, Jake discussed making payments to Alcaraz. On June 8, 2020—the date of several pornographic screenshots—Jake told Alcaraz that "Angela" would send her money that day. J.A. 249. The seized phone contained images of a receipt and proof of payout for an earlier MoneyGram transaction, which showed that Angela Carpenter transferred $100 to Alcaraz on May 12, 2020. In response to a customs summons, MoneyGram provided data revealing that Angela Carpenter sent the May 12 money transfer from a Wal-Mart store in Marion and Alcaraz received the money in the Philippines. The data also indicated that Whitney Carpenter, Angela's adult daughter, sent another $100 MoneyGram transfer to Alcaraz on June 12, 2020.

---

[2] A WhatsApp user can use the application on multiple phones despite originally creating an account with one phone number.

4

When reviewing the data from the three Google accounts, Brown found nine additional screenshots of child pornography from multiple WhatsApp video calls in March 2020. In addition, the search history data for the accounts contained several search terms that referred to child pornography.

B.

In a February 2021 superseding indictment, a federal grand jury charged Ross with five counts of producing child pornography (18 U.S.C. § 2251(a)) and one count of possessing child pornography (18 U.S.C. § 2252A). Ross pled not guilty, and the district court held a three-day jury trial in March 2021.

At trial, the Government first elicited testimony from law enforcement officers who played key roles in the investigation of Ross, including Brown, who testified in depth about the data extracted from the seized cell phone and Google accounts. The Government also called four women who had relationships with Ross: Angela Carpenter, Sosha Peters, Michele Tate, and Celeste Downing. The women testified that they witnessed Ross either participate in the WhatsApp calls, display other images of child pornography, talk about abducting or molesting children, or actually molest children. Angela Carpenter, for example, told the jury that Ross watched live videos of infant children—and sent messages instructing a woman in the Philippines to perform sex acts on the children—while Carpenter and Ross had sex. She further testified that she was performing oral sex on Ross in the corner images in certain screenshots from WhatsApp video calls. In other WhatsApp screenshots, a man in the corner image was wearing a shirt that Carpenter identified as

5

Ross's. Carpenter also confirmed that she sent payments to women in the Philippines on Ross's behalf, including the May 12 MoneyGram transfer to Alcaraz.

Peters's testimony—specifically, her in-court identification of Ross—is the most relevant to this appeal. Not long after Peters took the stand, the Government asked her to identify Ross in the courtroom. The following exchange ensued:

> GOVERNMENT: Okay. And when you came to Marion sometime in 2020 did you meet the defendant, Jacob Ross?
>
> PETERS: Yes.
>
> GOVERNMENT: And do you see him here in the courtroom today?
>
> PETERS: Hmm-mm. ("No.")[3]
>
> GOVERNMENT: You don't see him here in the courtroom? You can stand up if you need to.
>
> PETERS: Currently, no.
>
> GOVERNMENT: Okay.
>
> PETERS: I can't tell.
>
> GOVERNMENT: All right. So when you knew the defendant did he have a beard or not have a beard?
>
> PETERS: He did not.
>
> GOVERNMENT: Okay. And could that affect whether you recognize him?
>
> PETERS: Yes.
>
> GOVERNMENT: Okay. Your Honor, if I could go ahead and ask the defendant to remove his mask and we'll see if Ms. Peters can recognize him if he's not wearing a mask as well.
>
> THE COURT: Mr. Ross, if you would please take down your mask.

---

[3] This interpretation of Peters's response is contained in the trial transcript.

6

(Defendant indicating.)

PETERS:  Yeah.  Right here.  (Indicating.)

GOVERNMENT:  So you recognize the defendant now?

PETERS:  Yeah.

GOVERNMENT:  Are you certain of that?  Did the removal of the mask assist you with that?

PETERS:  Yeah.

GOVERNMENT:  Okay.  So go ahead.  And could you describe what he's wearing?

PETERS:  He's wearing a black tux.

GOVERNMENT:  A black jacket; is that right?

PETERS:  Yes, sir.

GOVERNMENT:  Okay.  And could you point to where he's located?

PETERS:  Right there.  (Indicating.)

GOVERNMENT:  And what color mask is he wearing right now?

PETERS:  White.

GOVERNMENT:  Your Honor, I'd ask the record to reflect the witness identified the defendant, Jacob Ross.

THE COURT:  The record will so reflect.

J.A. 468–69.  Ross's trial counsel did not object to Peter's in-court identification.

Peters went on to testify that she had a sexual relationship with Ross that began in late April or early May 2020 and continued for approximately one month.  She explained that she was homeless and "heavily under the influence of drugs" at the time and that Ross offered her "[d]rugs and money" to stay with him in the apartment attached to the Ross Skids Products office.  J.A. 472, 498.  According to Peters, Ross told her he was sexually

7

interested in children and showed her images of child pornography, including "live videos" that he cast from his cell phone to the television screen in the apartment. J.A. 475–76. Peters explained that Ross interacted with the person on the other end of the video calls. She specifically recalled that on one occasion, Ross "told one female to go get princess and show him her private areas," and that the woman on the other end complied. J.A. 477. Peters further stated that she performed oral sex on Ross while he watched the videos.

In addition, Peters provided testimony about other acts of child sexual abuse that Ross allegedly attempted or committed. She testified about text messages she received from Ross that discussed having young children brought to the apartment for sex. In graphic detail, Peters also recounted seeing Ross sexually molest two young children—a five-year-old girl and an eight-month-old boy. And she claimed that Ross had once blindfolded her and taken her to a building he called the "dungeon," where she saw five children Ross said he had "kidnap[ped] and [] was trying to sell."[4] J.A. 489.

The jury convicted Ross on all six counts. Based on Ross's offenses and lengthy criminal history, the presentence report ("PSR") concluded that the Sentencing Guidelines advised a sentence of 2,040 months (170 years). The district court adopted the PSR but imposed a downward variance sentence of 660 months (55 years). The court recognized that this was "tantamount to a life sentence" for Ross, who was forty-seven years old at the

---

[4] Angela Carpenter also testified that Ross had told her about a "dungeon," but Peters was the only witness who claimed to have visited it. Law enforcement never discovered such a place. Before arresting Ross, MCSO obtained a warrant to install a GPS tracking device on his vehicle in an effort to see "if there w[ere] any actual kids that [were] being held anywhere," but the tracking warrant did not produce any useful information. J.A. 100.

time of sentencing. J.A. 718. Nevertheless, it concluded that such a sentence was necessary given the severity of Ross's conduct, which it described as "among the most extreme that I have seen in these child porn cases." J.A. 716.

Ross timely appealed the district court's final judgment, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

On appeal, Ross first challenges the district court's role in Peters's in-court identification. Ordinarily, when a defendant fails to object to an identification at trial, we review the trial court's decision to admit the identification for plain error. *See United States v. Wilkerson*, 84 F.3d 692, 694–95 (4th Cir. 1996). Ross, however, argues that the procedure leading to Peters's identification qualifies as structural error—which warrants "automatic reversal"—because the district court actually identified him for the witness. *United States v. Poole*, 640 F.3d 114, 118 (4th Cir. 2011). In the alternative, even if the identification procedure was not structural error, Ross contends that it at least constitutes plain error. For the reasons that follow, neither argument is availing.

## A.

To qualify as structural, an error must not only "implicate a defendant's constitutional rights" but also "affect the very framework in which a trial proceeds." *Id.* Structural errors are "so intrinsically harmful to the proceeding that [they] render the trial an unreliable vehicle for determining innocence or guilt." *Id.* at 119. For example, an error may qualify as structural if it "calls into question the objectivity of those charged with

9

bringing a defendant to judgment," such as "when the trial judge is discovered to have had some basis for rendering a biased judgment." *Vasquez v. Hillery*, 474 U.S. 254, 263 (1986). Structural errors are "unquantifiable and indeterminate" and thus "defy analysis by 'harmless-error' standards." *Poole*, 640 F.3d at 119 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 281–82 (1993)).

This is a difficult standard to meet, and the Supreme Court has characterized errors as structural only in a handful of cases. *See Sullivan*, 508 U.S. at 281–82 (error instructing jury about the beyond-a-reasonable-doubt standard); *Vasquez*, 474 U.S. at 263–64 (racial discrimination in grand jury proceedings); *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984) (denial of defendant's right to self-representation); *Waller v. Georgia*, 467 U.S. 39, 49–50 (1984) (violation of right to public trial); *Glasser v. United States*, 315 U.S. 60, 76 (1942) (denial of counsel); *Tumey v. Ohio*, 273 U.S. 510, 535 (1927) (financially biased judge). Though it has not expressly held as much, the Supreme Court has indicated that errors in identification procedures do not rise to this level. It has explained that "[w]hile identification testimony is significant evidence, such testimony is still only evidence, and, unlike the presence of counsel, is not a factor that goes to the very heart—the 'integrity'— of the adversary process." *Manson v. Braithwaite*, 432 U.S. 98, 113 n.14 (1977) (citation omitted); *see also Watkins v. Sowders*, 449 U.S. 341, 348 (1981) (same). As such, the Court has declined to adopt a "strict exclusionary rule" for unduly suggestive identifications. *Manson*, 432 U.S. at 113.

This precedent leaves very little room for Ross to argue that the Peters identification qualifies as structural error. Indeed, the Second Circuit has relied on *Watkins* to hold that the

10

"erroneous introduction of identification evidence is not a structural error." *Wray v. Johnson*, 202 F.3d 515, 525 (2d Cir. 2000). Regardless of how suggestive the procedure might have been, Peters's in-court identification of Ross was "still only evidence," not a defect in the very framework of Ross's trial. *Manson*, 432 U.S. at 113 n.14. Ross's defense counsel had an opportunity to "both cross-examine the identification witness[] and argue in summation as to factors causing doubts as to the accuracy of the identification—including . . . any suggestibility in the identification procedure." *Id.* Thus, any error in admitting Peters's identification was not "unquantifiable and indeterminate." *Poole*, 640 F.3d at 119.

Ross counters that the identification procedure here was uniquely problematic because the district court made the identification *for Peters* and thereby "provided testimony against" Ross.[5] Reply Br. at 2. The district court's decision to refer to Ross by name might well have been ill-advised, but it is not enough to "call[] into question the [court's] objectivity." *Vasquez*, 474 U.S. at 263. The court's actions create no greater objectivity concerns than other alleged errors the Fourth Circuit has treated as non-structural. In *United States v. Poole*, for instance, the defendant claimed that the district court violated due process during a bench trial by referring repeatedly to his co-defendants' guilty pleas (which were not in evidence) and then relying on those pleas to convict the defendant. 640 F.3d at 116–18. This Court held that the district court's actions did not

---

[5] In fact, it was the Government—not the court—who first directed Peters's attention to Ross and identified him by name. After asking Peters if she had met "the defendant, Jacob Ross," the Government requested that the court "ask the defendant to remove his mask." J.A. 468–69. The court then stated, "Mr. Ross, if you would please take down your mask." J.A. 469.

qualify as structural error, but rather were "a classic example of a trial error." *Id.* at 119. It reasoned that the court's statements about the co-defendants' guilty pleas "occurred at various discrete times during the presentation of the case and in the court's memorandum opinion" and "c[ould] be measured against the other evidence that was properly admitted during the trial." *Id.*

The district court's alleged error here shares the same key features. For starters, Peters's identification occurred at a "discrete time" during the trial. *Id.* In addition, its impact "can be measured against the other evidence that was properly admitted during the trial"—including Peters's other testimony implicating Ross. *Id.* This Court has done exactly that in prior cases when reviewing the improper admission of identification testimony. *See, e.g.*, *United States v. Greene*, 704 F.3d 298, 303–04 (4th Cir. 2013) (holding that admission of resemblance testimony did not qualify as plain error because it did not affect the outcome of trial); *Thompson v. Leeke*, 756 F.2d 314, 316 (4th Cir. 1985) (applying harmless-error review to identification issue). To the extent the district court erred in admitting the Peters identification, that error would not fall within the "very limited class" of errors that qualify as structural. *Poole*, 640 F.3d at 119.

### B.

Having established that the district court's alleged error was not structural, we next must assess whether the court nonetheless plainly erred by creating or allowing an overly suggestive identification procedure. When reviewing the court's actions for plain error, we first ask whether the district court committed any error in relation to the Peters

12

identification. *See United States v. Moore*, 11 F.3d 475, 481 (4th Cir. 1993). Here, that question is dispositive, as Ross has failed to identify any cognizable error.

In his opening brief, Ross argued in passing that the Peters identification violated his due process rights. The Supreme Court has recognized that "reliability is the linchpin in determining the admissibility of identification testimony." *Manson*, 432 U.S. at 114. "[E]ven where unnecessarily suggestive procedures are used, due process does not require exclusion of the evidence if the identification was sufficiently reliable to preclude the substantial likelihood of misidentification." *United States v. Ivey*, 60 F.4th 99, 109 (4th Cir. 2023) (quoting *United States v. Saint Louis*, 889 F.3d 145, 152 (4th Cir. 2018) (cleaned up)).

Courts therefore follow a two-step framework for assessing due process challenges to identification testimony. "First, the court must consider whether the identification procedure is unnecessarily suggestive." *Greene*, 704 F.3d at 305 (quoting *Satcher v. Pruett*, 126 F.3d 561, 566 (4th Cir. 1997)). "Second, if the procedure was unnecessarily suggestive, a court must look at several factors to determine if the identification testimony is nevertheless reliable under the totality of the circumstances." *Id.* The relevant factors include: (1) "the opportunity of the witness to view the criminal at the time of the crime"; (2) "the witness' degree of attention" at the time of the offense; (3) "the accuracy of the witness' prior description of the criminal"; (4) "the level of certainty demonstrated by the witness at the confrontation"; and (5) "the length of time between the crime and the confrontation." *Saint Louis*, 889 F.3d at 153 (quoting *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972)). "We weigh these factors against the corrupting effect of the suggestive identification itself, keeping in

13

mind that the exclusion of such evidence is the exception to the rule that favors the admissibility of eyewitness identification for the jury's consideration." *Id.* (cleaned up).

While the Supreme Court articulated this framework in cases addressing the admissibility of prior out-of-court identifications (such as police lineups), we have applied the same test when evaluating a witness's first-time identification in court.[6] *See Greene*, 704 F.3d at 303. Here, even if we assume that Peters's identification of Ross involved an unduly suggestive procedure at the first step, Ross apparently concedes that he cannot prevail at the second step. During oral argument, his counsel admitted that the *Biggers* factors, if applied to Peters's identification, "weigh in favor of the Government."[7] Oral Argument at 7:00–7:32.

Ross's concession on this point is understandable. Peters's detailed trial testimony about her relationship and interactions with Ross leaves little doubt that her identification was reliable under the relevant factors.[8] First, her month-long intimate relationship with Ross—

---

[6] The Government argues that the two-step due process test applies only when law enforcement (including prosecutors) created the suggestive identification procedure, and thus is inapplicable here, where the court was responsible for the allegedly suggestive conditions. But we see no reason why the same framework is not equally applicable in this case. At any rate, as we have noted, the Government played a role in creating the allegedly suggestive conditions for Peters's identification.

[7] In his briefs, Ross did not even acknowledge the second step of the due process analysis or the *Biggers* factors, even after the Government discussed the factors in its response brief.

[8] The "*Biggers* factors" are best suited to evaluate the reliability of an identification made by an eyewitness who had one discrete run-in with the perpetrator. In *Greene*, for example, the witness was a bank teller who observed a robbery. *See* 704 F.3d at 301. While Peters's past relationship with Ross distinguishes her from the typical eyewitness, the *Biggers* factors remain useful in assessing the reliability of her identification.

14

a fact Ross never disputed at trial—certainly gave her numerous opportunities to view Ross around the time of his offenses. *Cf. Saint Louis*, 889 F.3d at 153–54 (concluding that the opportunity-to-view factor "strongly support[s] a finding of reliability" where a kidnapping victim "was able to see her captors and speak with them during the seven days she was held").

Second, Peters demonstrated a high "degree of attention" to details that corroborated her relationship with Ross and knowledge of the offenses. *Id.* at 154. She described the interior of the Ross Skid Products apartment in detail, including the color of the walls, which she accurately called "a teal color or bluish green." J.A. 472–73. More importantly, Peters recalled specific—and sometimes graphic—details about conversations she had with Ross, Ross's WhatsApp video calls, and sexual assaults she claimed he committed against two children.

Third, Peters's prior description of Ross in her June 2020 police report also proved accurate. At that time, Peters showed MCSO texts she had received from the 2873 number, which phone records confirmed was connected to Ross. When the Government asked her about the same text messages at trial, Peters immediately recognized them and again identified the phone number as Ross's.

The fourth factor, the witness's level of certainty at the time of the confrontation, is the only one that arguably weighs in Ross's favor. At trial, Peters initially could not identify Ross in the courtroom, even after the Government directed her attention to the "defendant, Jacob Ross." J.A. 468. But once the court instructed Ross to remove his mask, Peters identified him with certainty. This suggests that the mask, perhaps combined with Ross's beard (a recent change in his appearance), was the main impediment to an initial

15

identification. The fact that Peters could not identify the masked Ross even after the Government named him as the defendant seems to reinforce this point. In any event, Ross has never argued that the level-of-certainty factor—or any other factor, for that matter—demonstrates that Peters's identification was unreliable.

Fifth, and finally, while the ten-month gap between Peters's observations and her in-court identification "would be a seriously negative factor" in a typical eyewitness identification case, *Biggers*, 409 U.S. at 200, it does not create a reliability problem under the unique circumstances of this case. Unlike the conventional eyewitness, Peters did not merely observe Ross on one occasion, but had a month-long intimate relationship with him.

As Ross himself recognizes, the *Biggers* factors demonstrate that Peters's in-court identification was reliable, even if the procedure leading to that identification was improperly suggestive. Ross therefore cannot establish that the identification violated his due process rights.

III.

Ross separately argues that his fifty-five-year prison sentence is disproportionate to his offenses and therefore violates the Eighth Amendment. We review an Eighth Amendment proportionality challenge to a sentence de novo.[9] *United States v. Cobler*, 748 F.3d 570, 574 (4th Cir. 2014).

---

[9] The Government argues that Ross's proportionality challenge is subject to plain-error review because Ross failed to object to his sentence on this particular ground. We disagree. A defendant may preserve an issue by informing the court "when the court ruling or order is made *or sought*." Fed. R. Crim. P. 51(b) (emphasis added). Here, Ross (Continued)

16

A term-of-years prison sentence such as Ross's may violate the Eighth Amendment's prohibition on cruel and unusual punishment when it is "disproportionate to the crime for which it is imposed." *Id.* at 575. Ross raises an "as-applied" challenge to his sentence, alleging that his fifty-five-year sentence is disproportionately harsh "given all the circumstances in [his] particular case." *Id.* (quoting *Graham v. Florida*, 560 U.S. 48, 59 (2010)).

The Eighth Amendment's "narrow proportionality principle" "does not require strict proportionality between crime and sentence," but "forbids only extreme sentences that are grossly disproportionate to the crime." *Id.* (quoting *Graham*, 560 U.S. at 59–60). To determine whether a defendant's sentence meets this standard, an appellate court follows a two-step test. First, the court conducts "a 'threshold comparison' of the gravity of the offense and the severity of the sentence" and asks whether that comparison "leads to an inference of gross disproportionality." *Id.* (quoting *Graham*, 560 U.S. at 59–60). This step is satisfied only in a "rare case." *Graham*, 560 U.S. at 60. If the court concludes that it can draw such an inference, it next compares the defendant's sentence "(1) to sentences for other offenses in the same jurisdiction; and (2) to sentences for similar offenses in other

---

preserved his proportionality challenge in his sentencing memorandum, which, in arguing for a 360-month sentence, suggested that the much longer Guidelines sentence might be "subject to future [c]onstitutional review" as an Eighth Amendment violation. Sentencing Memorandum at 5–6, *United States v. Ross*, No. 1:20-CR-64-MR-WCM-1 (W.D.N.C. Jan. 13, 2022), ECF No. 54. At the sentencing hearing, Ross's counsel again asked the district court to "consider a sentence of 360 months" based on "the constitutional issues that we outlined in the sentencing memorandum," J.A. 704, and the district court noted it had reviewed the memorandum. Because Ross brought the issue to the court's attention, he did not also need to lodge a formal objection after the court imposed the 660-month sentence. *See Holguin-Hernandez v. United States*, 140 S. Ct. 762, 766 (2020) (holding that defendant preserved a reasonableness challenge to a sentence because he had "advocate[d] for a sentence shorter than the one ultimately imposed").

jurisdictions." *Cobler*, 748 F.3d at 575. The sentence violates the Eighth Amendment only if that comparative analysis validates the inference of gross disproportionality. *Id.*

The Supreme Court has identified a non-capital sentence as grossly disproportionate in just one case, where a repeat offender received a life sentence without parole for passing a bad check for $100. *Solem v. Helm*, 463 U.S. 277, 296–97 (1983). In reaching that conclusion, the Court emphasized that passing a bad check was "one of the most passive felonies a person could commit" and "involved neither violence nor threat of violence to any person." *Id.* The Court has rejected all other proportionality challenges to life sentences, consistently declining to draw the threshold inference of gross disproportionality. *See, e.g.*, *Ewing v. California*, 538 U.S. 11, 28–30 (2003) (upholding sentence of twenty-five years to life under California's "three-strikes" law, where defendant's third offense was theft of $1,200 in golf clubs); *Harmelin v. Michigan*, 501 U.S. 957, 997 (1991) (Kennedy, J., concurring in part and concurring in the judgment) (upholding sentence of life without parole for first-time offender convicted of possessing 672 grams of cocaine); *Hutto v. Davis*, 454 U.S. 370, 374–75 (1982) (per curiam) (upholding forty-year sentence for possession with intent to distribute nine ounces of marijuana); *Rummel v. Estelle*, 445 U.S. 263, 285 (1980) (rejecting proportionality challenge to mandatory life sentence under Texas recidivist statute for offense of obtaining $120.75 by false pretenses). The Fourth Circuit, too, has "not identified a grossly disproportionate life sentence or putative life sentence in the wake of *Solem*." *United States v. Said*, 798 F.3d 182, 198 (4th Cir. 2015).

18

Based on this precedent, we cannot infer that Ross's fifty-five-year sentence is grossly disproportionate to his offenses. Even if we assume that his sentence is the functional equivalent of a life sentence without the possibility of parole,[10] his child pornography offenses "are at least as grave as the drug offense in *Harmelin*, which the Supreme Court deemed sufficiently egregious to justify a similar sentence." *Cobler*, 748 F.3d at 580. On multiple occasions, Ross paid a woman in the Philippines not only to pose very young children in a pornographic manner, but also to molest them for his own sexual gratification. Ross's offenses, which directly facilitated the exploitation and sexual abuse of particularly vulnerable victims, are far from "one of the most passive felonies a person could commit." *Solem*, 463 U.S. at 296; *see also United States v. Dowell*, 771 F.3d 162, 168–69 (4th Cir. 2014) (emphasizing harm caused by exploitation and molestation of a young child in holding that defendant's 960-month sentence for producing child pornography did not give rise to threshold inference of gross disproportionality).

A functional life sentence is a severe punishment by any measure. That said, the Supreme Court has instructed that "rational legislative judgment[s]" to impose harsh sentences for serious offenses generally are "entitled to deference" in the proportionality analysis. *Ewing*, 538 U.S. at 30. Ross's sentence reflects Congress's "legislative judgment"—to which we defer—"that [child pornography is] harmful to the physiological, emotional, and mental health of children, and that preventing the sexual exploitation of this

---

[10] The Supreme Court has not clarified whether, for Eighth Amendment purposes, a lengthy term-of-years sentence may be treated as the equivalent of a sentence of life imprisonment without parole. *See Cobler*, 748 F.3d at 580 n.4.

uniquely vulnerable group 'constitutes a government objective of surpassing importance.'" *Cobler*, 748 F.3d at 580 (quoting *New York v. Ferber*, 458 U.S. 747, 757–58 (1982)).

Because this is not one of the "rare case[s]" where we can draw an inference of gross disproportionality, *Graham*, 560 U.S. at 60, Ross's Eighth Amendment challenge to his sentence fails.

## IV.

For the reasons stated in this opinion, we affirm the district court's judgment.

*AFFIRMED*